**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| United States of America,<br><br>     Plaintiff,<br><br>  v.<br><br><br>Christopher Ferguson,<br><br>     Defendant. | Case No. 1:26-CR-0031 |

**<u>DEFENDANT CHRISTOPHER FERGUSON'S SENTENCING MEMORANDUM</u>**

Bradley J. Bondi
Sara E. Ortiz
Samuel M. Deau (*Pro Hac Vice
Forthcoming)*
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 318-6601

*Counsel for Christopher Ferguson*

# TABLE OF CONTENTS

**Page(s)**

I. PRELIMINARY STATEMENT .............................................................................1

II. BACKGROUND.................................................................................................3

    A.    Chris Developed a Sense of Selflessness and Responsibility in His Childhood. ...............................................................................................3

    B.    Chris Excelled in School and Began Serving His Community During His Formative Years. ..........................................................................................4

    C.    Chris Launched a Career as an Entrepreneur, Founding Successful Businesses and Charities. ................................................................................5

    D.    Chris Acquired Edison Nation and Refocused the Company During the COVID Pandemic. .........................................................................................6

    E.    Chris's Family Loves and Supports Him. .............................................................8

III. ARGUMENT ...................................................................................................10

    A.    The PSR Recommends a Sentence of Probation. ...............................................10

    B.    The § 3553(a) Factors Support a Sentence of Probation. ...................................11

        1.    The Nature and Circumstances of the Offense Justify a Noncustodial Sentence Under § 3553(a)(1). .........................................12

            a.    There Is No Investor Loss. ..........................................................12

            b.    Mr. Ferguson Never Sought or Received a Gain from the Offense................................................................................................13

        2.    Mr. Ferguson's Personal History and Characteristics Justify a Noncustodial Sentence Under § 3553(a)(1). .........................................13

            a.    Mr. Ferguson's Acceptance of Responsibility Supports a Noncustodial Sentence. ..............................................................14

            b.    Mr. Ferguson's Offense Conduct Was an Anomalous Event in an Otherwise Exemplary and Law-Abiding Life. ...................15

        3.    A Custodial Sentence Is Not Necessary To Achieve the Objectives of § 3553(a)(2). ......................................................................18

            a.    Mr. Ferguson's Guilty Plea Provides General Deterrence...........18

            b.    Mr. Ferguson's Guilty Plea and Civil Settlement Provide Specific Deterrence...............................................................20

        4.    A Noncustodial Sentence Is Available Under § 3553(a)(3). ....................21

        5.    A Noncustodial Sentence Would Avoid Unwarranted Sentencing Disparities Under § 3553 (a)(6). .........................................................22

IV. CONCLUSION.................................................................................................24

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Gall v. United States*,
   552 U.S. 38 (2007) ................................................................................................ 11, 14

*Kimbrough v. United States*,
   552 U.S. 85 (2007) ....................................................................................................11

*SEC v. Ferguson*,
   1:26-cv-01482-DLC (S.D.N.Y. Feb. 27, 2026), Dkt. No. 8 .................................................21

*United States v. Alatsas*,
   No. 06 Cr. 473 (JBW), 2008 WL 238559 (E.D.N.Y. Jan. 16, 2008) ....................................19

*United States v. Bannister*,
   786 F. Supp. 2d 617 (E.D.N.Y. 2011) .......................................................................18

*United States v. Booker*,
   543 U.S. 220 (2005) ..................................................................................................11

*United States v. Broxmeyer*,
   699 F.3d 265 (2d Cir. 2012)........................................................................................14

*United States v. Cheng Lin*,
   23-cr-598 (JPO), Dkt. No. 71 (S.D.N.Y. May 14, 2024) ......................................................15

*United States v. Doe*,
   323 F. Supp. 3d 368 (E.D.N.Y. 2018) .............................................................................20

*United States v. Gaind*,
   829 F. Supp. 669 (S.D.N.Y. 1993), *aff'd,* 31 F.3d 73 (2d Cir. 1994)....................................21

*United States v. Gomez*,
   No. 11-Cr.-96-01 (RWS), 2013 WL 818717 (S.D.N.Y. Mar. 4, 2013)................................13

*United States v. Harris*,
   No. 16 Cr. 851 (VSB), 2020 U.S. Dist. LEXIS 145442 (S.D.N.Y. Aug. 12,
   2020) ............................................................................................................... 15, 16

*United States v. Jacoby*,
   No. 17-cr-676, Dkt. Nos. 13, 15, 19 (S.D.N.Y. 2018) .................................................. 22, 23

*United States v. McCarthy*,
   No. 22 Cr. 491 (NRM), 2023 WL 3741996, (E.D.N.Y. May 30, 2023) .............................19

*United States v. Mears*,
   758 F. App'x 92 (2d Cir. 2018)....................................................................................14

*United States v. Munir*,
No. 12-cr-648-1, 2013 WL 3466558 (E.D.N.Y. Jan. 9, 2013) ...........................13

*United States v. Nesbeth*,
188 F. Supp. 3d 179 (E.D.N.Y. 2016) .................................................................21

*United States v. Petrelli*,
306 F. Supp. 2d 449 (S.D.N.Y. 2004).................................................................15

*United States v. Velazquez*,
No. 16 Cr. 233 (AKH), 2017 WL 2782037 (S.D.N.Y. May 26, 2017).................18

*United States v. Villella*,
No. 07 Cr. 287 (RWS), 2007 U.S. Dist. LEXIS 72712 (S.D.N.Y. Sep. 25,
2007) ...................................................................................................................19

**Statutes**

17 C.F.R. § 240.13b2-1 ...................................................................................................10

15 U.S.C. § 78m and 78ff................................................................................................22

15 U.S.C. §§ 78m(b)(2), 78m(b)(5) and 78ff.................................................................10

18 U.S.C. § 2 ...................................................................................................................10

18 U.S.C. § 3553(a) ........................................................................................... 10, 11, 12

18 U.S.C. § 3553(a)(1)–(3), (6)–(7) ...............................................................................12

18 U.S.C. § 3553(a)(1) ............................................................................................... 12, 13

18 U.S.C. § 3553(a)(2) ...................................................................................................18

18 U.S.C. § 3553(a)(3) ...................................................................................................21

U.S.S.G. § 2B1.1(a)(1)....................................................................................................10

U.S.S.G. § 2B1.1(b)(1)....................................................................................................12

U.S.S.G. § 2B1.1(b)(20)(A)(i) ........................................................................................10

U.S.S.G. § 3E1.1(a)..........................................................................................................10

U.S.S.G. §§ 4C1.1(a) and (b)..........................................................................................11

U.S.S.G. § 5C1.1................................................................................................... 2, 11, 21

U.S.S.G. § 5F1.2..............................................................................................................21

Defendant Christopher Ferguson respectfully submits this Sentencing Memorandum in advance of his sentencing scheduled for May 4, 2026.

## I.       PRELIMINARY STATEMENT

Christopher Ferguson—successful entrepreneur, dedicated family man, philanthropist, and devoted citizen—touched countless lives for the better throughout his exemplary life.  The Court should consider these defining attributes in determining the appropriate sentence for a father and husband pleading guilty to his first and only offense.  Despite challenging circumstances in his childhood that required him to care for his ailing mother and work through high school independently, Chris went on to become an accomplished executive and investor who founded or revitalized eight businesses, helped prospective inventors and entrepreneurs start their own businesses, and employed hundreds of other employees in sales, finance, administrative, and other positions.  Outside of his professional life, Chris contributed to the community by mentoring underprivileged youth, starting a charity called Create More Karma in 2009, and volunteering at the Cooper House since 2023, an organization that creates a healthy support system for foster children in crisis.  Chris embodies the virtues of a servant leader and strives to make his companies and community better places to live and work.

Chris deeply regrets the critical lapse in judgment that led to this conviction—a mistake and a severe aberration from his otherwise unblemished record of ethical leadership, professionalism, and service.  Chris, as CEO of his family's company Edison Nation, falsified a spreadsheet submitted to the Financial Industry Regulatory Authority ("FINRA"), a private self-regulatory organization overseeing United States broker-dealers during a confidential inquiry in April 2020.  It is undisputed that the offense conduct caused no monetary loss to investors or anyone else and generated no monetary gain for Chris.  Chris did not create or solicit the backdated order that was referenced in the spreadsheet and was not aware of or involved in those efforts.  By

-1-

pleading guilty and settling with civil regulators, Chris has taken full responsibility for the sole criminal offense he has committed. Chris also has paid a civil penalty to the Securities and Exchange Commission ("SEC") and agreed not to serve as an officer or director of a publicly traded company for five years—far exceeding the likely duration of his working life. There is no risk of recidivism here.

Now 57 years old, Chris has stepped back from professional life to focus time and attention on his family and community service going forward. Chris and his wife Aimee live in rural Indiana. Chris is a father of three children who rely on him for financial and emotional support. Aimee is a mother of six children, two of whom still live with Chris and Aimee and all of whom consider Chris a father. Chris also takes great pride in being a grandfather. Chris's family and faith form the core of a robust support network that already has provided encouragement and inspiration through this distressing period in his life. The many support letters describing Chris's character and continuing acts of service further demonstrate the positive contribution Chris will continue to make to his family and community in the coming months and years.

We respectfully request that the Court impose a sentence of probation. The Presentence Investigation Report ("PSR") and the Plea Agreement both correctly calculate the Sentencing Guidelines range as zero to six months. Importantly, the Probation Office recommends the Court "impose a sentence of 3 years' probation." PSR at 24. The proposed sentence is consistent with Probation's recommendation, the Guidelines range, and the Guidelines commentary confirming that a noncustodial sentence is "generally appropriate" for a first-time offense of this nature. *See* U.S.S.G. § 5C1.1 (Application Note 9).

-2-

## II.    BACKGROUND

### A.    Chris Developed a Sense of Selflessness and Responsibility in His Childhood.

Chris remembers fondly the early years of a childhood that forged his character.  Born in Phillipsburg, New Jersey, to Thomas and Patricia Ferguson, Chris is the youngest of four children. His father Thomas, a World War II Navy veteran, was an entrepreneur who founded a corrugated box factory in 1958, and his mother Patricia was a homemaker.  He still recalls school nights where he would wake up in the middle of the night with his father to make black and white milkshakes and watch classic movies such as *Bridge over the River Kwai* and *Casablanca*.

Chris's childhood was turned upside down in 1974, when Chris's mother suffered an aneurysm that left her with serious health complications, including numerous strokes.  Her health issues compounded as she developed severe alcohol dependence to cope with these complications. When Chris turned twelve, his parents divorced.  Chris was forced to decide which parent to live with.  Although his father was his idol and he knew his father would provide a stable home, Chris chose to live with his mother because he saw that she otherwise would be alone and in need. Chris's older brothers Scott, Stuart, and Kevin were eight to fifteen years older than Chris and already in college or living independently, so Chris was the only person nearby able to care for his mother.  Consequently, as described by Chris's brother Kevin, Chris was left "with virtually no parental authority in his life from ages 10 to 18." Kevin Ferguson Support Letter, Ex. A-09.  Chris recalls grocery shopping, cooking, and doing laundry for himself and his mother.  Many days, he would come home from school to find his mother passed out in a chair next to a bottle of vodka. Although he tried to assist his mother, her health conditions were too severe for Chris to address alone.  When Chris was fifteen, his mother moved to a full-time skilled nursing facility.

Chris's childhood often was dark and lonely, but these experiences engrained in him a sense of empathy, kindness of heart, and independence.  In electing to care for his mother, Chris

rose above moments of emptiness to become a self-sufficient and responsible young man. As his brother confirms, "[Chris] developed character not through a one-time event, but through daily choices." *Id.*

### B. Chris Excelled in School and Began Serving His Community During His Formative Years.

After his mother was moved to the skilled-nursing facility, Chris remained in his mother's home without ordinary parental guidance. As his brother Kevin described in the PSR, it would have been easy for Chris "to give into temptation or go down the wrong path," but Chris never wavered. PSR at 9. Chris "[kept] his morals intact and ma[de] the right choices in life, despite the tough position he was in while living alone unsupervised in his childhood home." *Id.*

Chris's positive daily choices forged a resolute moral character evident from his high school years and in his early professional life. Chris excelled in his education through discipline, resilience, and self-reliance. In high school, Chris graduated eighth in his class of 300 students. Chris was a natural leader that his peers looked up to. He was captain of the golf team, president of the drama club, and a performer in many of his school plays.

Following high school, Chris attended Villanova University, where he majored in Communications and minored in Theatre. Chris chose Villanova because his Uncle Joe Bradley was a priest and professor of theology there. Chris admired his Uncle Joe's morals and steadfast belief in what his uncle often described as "standing up for the little guy." His Uncle Joe's initiatives included leading missions to Peru, protesting the Vietnam war, and mentoring underprivileged children in Philadelphia. Chris also took after his uncle's penchant for mentoring. Mary Ellen Bradley, whom Uncle Joe married after leaving the priesthood later in life, described Chris's ability to "establ[ish] a rapport and bond[]" with his student mentee, Haniff, whom Chris mentored while attending university. *See* Mary Ellen Bradley Support Letter, Ex. A-14. To this

-4-

day, Chris still remembers mentoring Haniff, whose father was murdered. The two played basketball together, and Chris recalls standing up for him when other kids would tease him. Chris's experience with Haniff rooted what would become a lifelong passion for mentoring and volunteering.

### C.    Chris Launched a Career as an Entrepreneur, Founding Successful Businesses and Charities.

Chris established himself as a serial entrepreneur who went on to employ thousands of people across decades of building businesses from the ground up and expanding acquired businesses. Chris entered successful ventures with friends and business partners and formed new bonds with mentors, mentees, and other colleagues. Chris also founded several charitable organizations that still touch the lives of hundreds today.

Chris's professional life has been marked by leadership, innovation, and generosity. His former colleagues and employees speak to Chris's integrity and optimism in business ventures. *See* Frank Jennings Support Letter, Ex. A-26 ("He is a creative, optimistic, smart, and fair businessman. I learned so much from him. We proceeded to partner together on numerous business ventures and Chris continuously displayed impeccable morals, ethics, and business acumen."); Michael Perrucci Support Letter, Ex. A-33 ("This close business relationship gave me a bird's eye view of his character. I can say unequivocally he was an honest and trustworthy partner.").

Chris's entrepreneurial instincts were instilled by his father. Thomas Ferguson owned a corrugated-box plant called Ferguson Containers, which Chris and his brothers eventually inherited. Inspired by his father's example, Chris started his first company in 1989 with friends from Villanova. The venture, called "The Butler Did It," partnered with local video-rental shops and restaurants and delivered dinner and a movie to students for a small fee.

Chris's entrepreneurship earned him the trust of former New Jersey Governor Jim Florio. After Chris attended law school, he returned to his former entrepreneurial pursuits by joining the former governor's firm, Florio & Perrucci, to manage Governor Florio's investment company, The Florio Group.  Governor Florio served as a partner, mentor, and close friend for decades.

Chris then embarked on his own ventures, applying what he learned about business, investment, and community involvement from Governor Florio.  In 2001, he co-founded a staffing company, Mercer Staffing, which employed a significant workforce and issued over 30,000 W-2s. Mercer Staffing became one of the top 20 fastest-growing private companies in the U.S. in 2006. In 2007, Chris sold Mercer Staffing and launched the CMK ("Create More Karma") Resource Group.  CMK provided the Wellness Recovery Action Plan program to social workers and behavioral therapists in the Philadelphia school system.  Through CMK, Chris saw firsthand the impact of social workers on local children with unstable home environments.  As just one example, Chris enabled one young boy who recently lost several family members and his home to attend a summer camp at his alma mater, Villanova.

This experience inspired Chris to launch the CMK Foundation in 2009 (now called BuKoo's Waddle), a nonprofit organization that still funds entertaining and formative programming for community members in need.  The CMK Foundation was the first of several charitable endeavors for Chris.  In 2019, Chris created a fundraiser for a longtime friend suffering from stage-four colon cancer, and since 2023, he has supported the Cooper House, a charity that provides support to foster children during times of crisis.

**D.     Chris Acquired Edison Nation and Refocused the Company During the COVID Pandemic.**

Chris's next business venture was the first of several investments that led to his acquisition of Edison Nation.  In 2013, he acquired a company called SRM, which designed and developed

novel and educational toys for theme parks such as Disneyland and retail outlets such as Walmart. After a downturn in SRM's business, Chris decided to raise capital for SRM and Ferguson Containers by going public. Around this time, he also acquired Xspand Products Lab, which was later renamed Edison Nation—a platform for inventors to submit ideas for consumer products and novelties eventually for license to large retailers. Edison Nation also owned the rights to an Emmy-winning television show called *Everyday Edisons*, a concept similar to *Shark Tank* where a panel of experts helped innovators refine and bring their visions to life on camera.

Edison Nation and SRM's businesses suffered in early 2020 as COVID-19 caused the supply and demand for consumer products to evaporate. Edison Nation, which was fundamentally a distribution business, pivoted to the purchase and sale of personal protective equipment ("PPE"), such as gloves and hand sanitizer. In an unstable market, the company leveraged its U.S. and foreign supply-chain connections to procure PPE and redeployed its sales team to identify customers. Edison Nation relied on co-defendant Brian McFadden and other consultants to facilitate the transition to selling PPE. Unfortunately, the offense conduct to which Chris pleaded guilty also occurred during this period. But that isolated lapse in judgment should not detract from Edison Nation's contributions to fighting the pandemic and fulfilling many PPE orders from U.S. customers, including millions of dollars in sales to public school districts, counties, and private customers and brokers during a time when hand sanitizer and other PPE was practically impossible to source.

Chris's professional and philanthropic endeavors have brought great success and joy to his colleagues, customers, constituents, and countless others in his community. As a few examples, he facilitated employment for thousands of individuals through Mercer Staffing; he fostered innovation through inventive and entertaining products at SRM and Edison Nation; and he gave

back to his community through his volunteer efforts and by coaching his children's sports teams and drama groups. The offense conduct truly was an anomaly in an otherwise distinguished educational, professional, and philanthropic life.

### E.      Chris's Family Loves and Supports Him.

Chris is a family man. He is a dedicated husband, father, grandfather, and brother. Because Chris grew up without a strong family support system, he always recognized the value of family. His family relies on him for support, and he relies on them for support. As detailed by many of the support letters, there is nothing more important to Chris than his family.

Chris began his journey as a husband and father in August 2001, when he married Lelainya Ferguson. Chris and Lelainya raised three children: Xiomara, Brendan, and Kylah. Although Chris and Lelainya no longer are married, Lelainya still describes Chris as "a devoted father to [their] 3 children and a deeply engaged parent. His role in their lives has always been active, intentional, and loving. He has coached all three of our children in their respective sports, dedicating countless hours to teaching teamwork, respect for others, perseverance, and encouragement." *See* Lelainya Ferguson Support Letter, Ex. A-13.

Xiomara ("Mara") Ferguson is Chris's oldest child. Mara described her father as "an extraordinary and very present parent who found purpose and fulfillment in creating the magic of childhood for my siblings and myself. I will never forget the magic of my childhood, and how my father taught me to never let go of the youth that lives on in all of us." *See* Xiomara Ferguson Support Letter, Ex. A-02. She considers her father "instrumental in nursing my passion for theatre and performance and is still a well-known pillar of the local Pennsylvania Youth Theatre community[.]" *Id.* According to Chris's son Brendan, "[Chris] is the best dad I could've asked for." *See* Brendan Ferguson Support Letter, Ex. A-03. Brendan fondly remembers playing basketball with his father, who coached all of his teams regardless of the sport. *Id.* Kylah, Chris's

youngest daughter, states: "I have come to know him as a friend, a dedicated parent, and a steady support system. I have always known my dad to look for the good in people and the world. Even during the most difficult of situations he chooses to act with hope and positivity, knowing there is power in your outlook." *See* Kylah Ferguson Support Letter, Ex. A-04. Although Chris has achieved much in his professional life, he is most proud of his children. Chris continues to support his children as they finish college and embark on their own professional lives.

Chris also has the love and support of Aimee Ferguson, his wife. Chris and Aimee met while working at Edison Nation. "When I met Chris working at Edison Nation in 2019, what first struck me about him was not romance, but his presence, his kindness, his joy, and the incredible energy Chris brought when he entered the room. He is the type of person that puts you at ease and makes you feel valued and seen. He is kind, engaging, and when you meet him for the first time, he makes you feel as though you have been a friend forever." *See* Aimee Ferguson Support Letter, Ex. A-01. Their relationship has been defined by love and support for one another. Chris also loves and supports Aimee's six children, "he calls them his own, he treats them just as they are his children – and they love him." *Id.*

Chris remains Aimee's rock even through the investigation and guilty plea. Aimee observed that throughout this process, Chris "has been hesitant and scared to fly to see his children at their colleges. He now worries about every detail in what should seem like normal activity. I have seen this good and humble man on his knees weak and crying. And through all this – what I have not seen change is his character. Through these trials, Chris has continued to serve others just as he did before this. When I look at everything he has done in the past couple years since this started, I can't believe he's been able to still do so much while dealing with such a dark time." *Id.*

Chris finds his strength through his faith and his family. He will continue to serve them and others and remains undaunted by this setback. Although this process has humbled him greatly, he continues to strive to be the best person for Aimee, his children, and his community.

## III.   ARGUMENT

The Court should render a sentence of probation. The Probation Office recommended a probation sentence in the PSR, and that sentence reflects a Guidelines sentence as calculated in the PSR and the Plea Agreement. All interested parties agree with the Guidelines, and here, probation is the appropriate outcome for a first-time offense of this nature. Similarly, the § 3553(a) factors support a sentence of probation because all relevant factors support a sentence at the low end of the Guidelines range.

### A.   The PSR Recommends a Sentence of Probation.

On January 28, 2026, Mr. Ferguson pleaded guilty to a one-count felony Information charging him with falsification of books, records, and accounts in violation of 15 U.S.C. §§ 78m(b)(2), 78m(b)(5) and 78ff; 17 C.F.R. § 240.13b2-1; and 18 U.S.C. § 2. Mr. Ferguson willfully and knowingly falsified or caused to be falsified a book, record, or account of Edison Nation. Specifically, Mr. Ferguson caused to be falsified a spreadsheet of Edison Nation purchase orders that falsely listed a $9 million purchase order as received on April 13, 2020, when in reality it was received at a later date. The falsified spreadsheet was provided to FINRA in response to a confidential inquiry.

The PSR and Plea Agreement correctly calculate the applicable Sentencing Guidelines. Under both the PSR and Plea Agreement, the applicable Sentencing Guidelines calculations are:

- Base Offense Level (USSG § 2B1.1(a)(1)): 7

- Officer or Director Enhancement (USSG § 2B1.1(b)(20)(A)(i)): 4

- Acceptance of Responsibility (USSG §3E1.1(a)): -2

- Zero-Point Offender Reduction (USSG §§ 4C1.1(a) and (b)): -2

- **Total Offense Level: 7**

The Probation Office recommended a sentence of probation.  PSR at 24.  According to the Guidelines commentary, probation is the "generally appropriate" sentence.  U.S.S.G. § 5C1.1 (Application Note 9).  The parties also stipulated to the same Guidelines calculation in the Plea Agreement.  In other words, the Probation Office, the government, and Mr. Ferguson, all agree with the Guidelines recommendation.  And under the Guidelines, probation is a "generally appropriate" sentence.

### B.    The § 3553(a) Factors Support a Sentence of Probation.

The § 3553(a) factors similarly support a sentence of probation.  Under 18 U.S.C. § 3553(a), "[t]he court shall impose a sentence sufficient, but not greater than necessary" to serve the objectives of sentencing.[1]  Section 3553(a) lists factors to consider in imposing a sentence, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available; . . .
>
> (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

---

[1] The Sentencing Guidelines are "effectively advisory," *United States v. Booker*, 543 U.S. 220, 245 (2005), and mark only the "starting point and initial benchmark" at sentencing.  *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)).

18 U.S.C. § 3553(a)(1)–(3), (6)–(7).

All relevant factors support a probationary sentence.  *First*, the nature and circumstances of the offense and Mr. Ferguson's personal history and characteristics warrant a noncustodial sentence.  *Second*, a noncustodial sentence reflects the seriousness of the offense and provides just punishment because Mr. Ferguson has suffered and will continue to suffer collateral consequences as a result of the offense.  A noncustodial sentence will afford adequate general and specific deterrence, and a custodial sentence is not necessary either to protect the public or to provide Mr. Ferguson with education or vocational training, medical care, or other correctional treatment. *Third*, probation is an available—and generally appropriate—sentence in this case.  *Fourth*, a noncustodial sentence is the typical and necessary sentence to avoid unwarranted sentencing disparities amongst similarly situated defendants.  *Fifth*, under both the PSR and Plea Agreement, there are no victims entitled to restitution.

A sentence of probation would be sufficient and not greater than necessary under § 3553(a).

1.      **The Nature and Circumstances of the Offense Justify a Noncustodial Sentence Under § 3553(a)(1).**

There are two reasons why the nature and circumstances of this atypical offense warrant a probation sentence: (1) there was no loss to investors; and (2) Mr. Ferguson did not incur any profit from the offense.  Both are significant mitigating factors warranting a Guidelines sentence of probation.

a.      **There Is No Investor Loss.**

It is undisputed that Mr. Ferguson did not cause a loss to anyone—including investors in Edison Nation.  As stated in the PSR, "the offense did not result in any reasonably foreseeable pecuniary harm."  PSR at 5.  Similarly, the Plea Agreement states "[t]he offense of conviction did not result in any reasonably foreseeable pecuniary harm (*i.e.*, no actual loss under Note (C)(i) to

the Loss Table under U.S.S.G. § 2B1.1(b)(1)), nor did the defendant purposely seek to inflict pecuniary harm (*i.e.* no intended loss under Note (C)(ii) to the Loss Table)." Plea Agreement at 2. There is no dispute that Mr. Ferguson's offense did not cause any loss.

Where an offense does not result in harm to others, courts recognize that the crime is of lesser severity and even may warrant a downward departure from the Guidelines. *See, e.g.*, *United States v. Gomez*, No. 11-Cr.-96-01 (RWS), 2013 WL 818717, at *6 (S.D.N.Y. Mar. 4, 2013) ("In consideration that there was no loss caused by the defendant in this case, a sentence calculated by the Guidelines, seems unnecessary.").

### b.    Mr. Ferguson Never Sought or Received a Gain from the Offense.

It is undisputed that Mr. Ferguson never sought to receive, and never received, any financial benefit from the offense. *See* PSR at 5 ("[Mr. Ferguson] did not profit or attempt to profit from this offense."); Plea Agreement at 2 ("[Mr. Ferguson] did not profit or attempt to profit from the conduct, so there is not quantifiable gain.").

Where a defendant does not seek to profit or does not profit from an offense, courts recognize that the crime is of lesser severity. *See, e.g.*, *United States v. Munir*, No. 12-Cr.-648-1, 2013 WL 3466558, at *2 (E.D.N.Y. Jan. 9, 2013) (sentencing defendant who pleaded guilty to insider trading to a brief period of time served, in part, because he did not "receive any money" in consideration for his crime). Because Mr. Ferguson did not profit or attempt to profit from providing a falsified document to FINRA, the nature and circumstances of the offense support a noncustodial sentence.

### 2.    Mr. Ferguson's Personal History and Characteristics Justify a Noncustodial Sentence Under § 3553(a)(1).

A sentencing court must consider any and all information relating to the background, character, and conduct of the defendant in order to "make an individualized assessment based on

the facts presented." *Gall*, 552 U.S. at 50; *see also United States v. Mears*, 758 F. App'x 92, 94 (2d Cir. 2018) ("[I]t is [h]ighly relevant—if not essential—to [the] selection of an appropriate sentence that [the sentencing court] possess the fullest information possible concerning the defendant's life and characteristics.") (citing *United States v. Broxmeyer*, 699 F.3d 265, 293 (2d Cir. 2012)) (internal quotation marks omitted).

There are two reasons why Mr. Ferguson's personal history and characteristics support a probation sentence: (1) Mr. Ferguson has accepted responsibility for his crime; and (2) Mr. Ferguson's misconduct was an anomalous event in an otherwise exemplary and law-abiding life. Both reasons demonstrate that Mr. Ferguson will learn from his mistake and continue his otherwise law-abiding life by supporting others and making positive contributions to society.

### a.    Mr. Ferguson's Acceptance of Responsibility Supports a Noncustodial Sentence.

Mr. Ferguson has accepted responsibility for his crime. *See* PSR at 6 ("[Mr. Ferguson] has clearly demonstrated acceptance of responsibility for the offense.") Mr. Ferguson pleaded guilty to the offense, and his early guilty plea came months before co-defendant Brian McFadden's plea. Mr. Ferguson did not plead guilty because a co-defendant pleaded guilty and he had no other option; Mr. Ferguson pleaded guilty out of genuine remorse and in recognition of his wrongdoing.

Mr. Ferguson's acceptance of responsibility and contrition is recognized by his family and friends. As but one example, Roger Kent, a longtime friend, stated: "I have seen Chris reflect deeply on the circumstances that have brought him before the Court. He has taken responsibility for his actions and expressed sincere remorse. The Chris I know is not defined by this chapter, but by a lifetime of hard work, devotion to family and friends, and meaningful contributions to his community and professional circles." *See* Roger Kent Support Letter, Ex. A-30. Thomas Johnstone, another close friend, stated: "Throughout this legal process, [Chris] has spoken openly

-14-

about responsibility and the consequences of his decisions.  From my perspective, his remorse is genuine, and he has approached this experience not defensively but as a profound personal reckoning."  *See* Thomas Johnstone Support Letter, Ex. A-29.

Mr. Ferguson has learned from his mistakes.  He has accepted responsibility for his actions, and he never avoided facing the consequences.  He has informed all of his family and friends of his crime and is using it as a learning moment for those he interacts with.  Mr. Ferguson's complete acceptance of responsibility supports a sentence of probation.

### b.  Mr. Ferguson's Offense Conduct Was an Anomalous Event in an Otherwise Exemplary and Law-Abiding Life.

Mr. Ferguson is a first-time offender with no prior arrests or criminal history and a demonstrated record of positive professional and charitable endeavors.  There is absolutely no evidence that Mr. Ferguson's conduct was anything other than an isolated and unplanned mistake that significantly deviated from five-plus decades of upstanding behavior.

Courts favorably consider a defendant's law-abiding life when rendering a sentence.  *See United States v. Cheng Lin*, 23-cr-598 (JPO), Dkt. No. 71, at 7 (S.D.N.Y. May 14, 2024) (sentencing defendant to two years' probation after he pleaded guilty to conspiracy to commit bank fraud in part because "he has no prior criminal convictions or problems with the law.  The letters speak to the fact that he has had a positive impact on others in his life.  I do think that this is aberrational."); *United States v. Petrelli*, 306 F. Supp. 2d 449, 452 ("Aberrant behavior is defined as a single criminal occurrence or transaction that was committed without significant planning; was of limited duration; and represents a marked deviation by the defendant from an otherwise law-abiding life.") (citation omitted).

Courts also consider a defendant's history and personal characteristics through letters of support.  *United States v. Harris*, No. 16 Cr. 851 (VSB), 2020 U.S. Dist. LEXIS 145442 (S.D.N.Y.

Aug. 12, 2020), is instructive on the relevance of Mr. Ferguson's character.  In *Harris*, the defendant pleaded guilty to conspiracy to commit wire fraud in connection with a credit card fraud and identity theft scheme, which involved numerous victims.  The defendant previously had been arrested and convicted of a similar offense.  *Id*. at \*1.  During sentencing, the court considered "[t]hat others who have written on your behalf have expressed that they believe that you are, in fact, remorseful and that you're turning a corner based upon the fact that you're gainfully employed and I guess their interactions with you and in the comments that you've made.  So I'll consider their views of your character in connection with deciding what an appropriate sentence is for you." Dkt. No. 225 at 29.  The court sentenced Harris significantly below both the recommendation of the Sentencing Guidelines and the statutory maximum.  *Id*. at \*3 (imposing sentence of "38 months imprisonment, three years of supervised release, and order[ing] him to pay approximately \$200,412.70 in restitution to the victims of his offense").

The numerous letters from Mr. Ferguson's friends and family speak volumes about his character and support a probation sentence.  Mr. Ferguson's friends and family describe an honest, ethical man of strong moral character throughout all stages of life.

- Melissa Bond Sakimura, a lifelong friend, describes Mr. Ferguson as "someone who believes in doing the right thing, even when it is not easy. . . . Chris does not make excuses.  Instead, he reflects, learns, and works towards growth."  *See* Melissa Bond Sakimura Support Letter, Ex. A-18.

- Frank Jennings, also a lifelong friend and member of the Board of Directors at Edison Nation, describes Mr. Ferguson as a man with "impeccable morals, ethics, and business acumen."  *See* Frank Jennings Support Letter, Ex. A-26.  Mr. Jennings and Mr. Ferguson founded the Create More Karma Foundation to "create more karma" in the world.  *Id.*  The foundation aids people in need through fulfilling direct needs or donating items to children in need.  Overall, Mr. Jennings considers Mr. Ferguson a dedicated community member, a philanthropist, and a person who makes "our town a better place to live."  *Id.*

- Mary Ellen Bradley, Chris's aunt, describes Chris as "a positive contributing member to any community he is involved in."  *See* Mary Ellen Bradley Support Letter, Ex. A-14.  Ms. Bradley "was totally surprised that despite his chaotic childhood he was

-16-

enthusiastic, warm and obviously resilient.  As an adolescent he appeared to focus on the positive in life rather than the hurt and deprivation.  As an adult Chris continued this positivity and his concern and compassion especially toward those with less resources was observable." *Id.*  Finally, Ms. Bradley observed that Chris "is remorseful and this action is so out of character for him." *Id.*

Each letter submitted in support of Mr. Ferguson describes a man who has given much to his family, colleagues, and community despite starting with so little.  He has persevered through adversity and offered opportunities to countless budding entrepreneurs, co-workers, and those less fortunate.  As Ms. Bradley stated, "prison is not the place for Chris." *Id.*

Mr. Ferguson's family relies on him for emotional and financial support.  Mr. Ferguson and his wife Aimee spend every day together.  The emotional toll from any period of incarceration would be significant.   Also, Chris and Aimee run a nascent business together.  They are the sole owners and employees of a small development company that sells modular inflatables to improve shoreline recreational spaces.  Any period of incarceration would risk destroying the business that helps to support Aimee, Chris's children, and Aimee's children who live with her.  Mr. Ferguson travels regularly to meet with potential clients interested in purchasing the modular inflatables.  These in-person meetings and site visits are essential to the ongoing operation of the business.  Although the income the couple earns from this business is modest, Mr. Ferguson supports his three children who are all in college.  He pays tuition, rent, and some living expenses.  The ongoing operation of the business is necessary to maintain financial support for his family.

Mr. Ferguson also depends on income from the business to support another family member.  Mr. Ferguson's brother, Stuart, currently is suffering from early-stage dementia diagnosed in mid-March 2026.  Stuart's dementia emerged rapidly after he was discovered wandering down a highway with no recollection of why he was there.  Stuart could not locate his vehicle, which remained missing for a month.  Mr. Ferguson serves as Stuart's power of attorney and is an essential support person to him.  Although Stuart lives in Pennsylvania, Mr. Ferguson has visited

Stuart numerous times over the past six weeks and has assisted in moving him into a long-term care facility. Supporting a family member with this disease would be difficult under normal circumstances; Mr. Ferguson must navigate these challenges while preparing for sentencing. Any period of incarceration will disrupt his support for Stuart in what may be the last months of Stuart's life.

The Court should consider Mr. Ferguson's acceptance of responsibility, otherwise exemplary lifelong moral character, and disruption to the lives of those who depend on Mr. Ferguson as significant mitigating factors and extenuating circumstances supporting a noncustodial sentence.

### 3. A Custodial Sentence Is Not Necessary To Achieve the Objectives of § 3553(a)(2).

A probation sentence achieves the objectives of criminal punishment by providing both general and specific deterrence, promoting respect for the law, and protecting the public from any harm. *See* 18 U.S.C. § 3553(a)(2). A custodial sentence is not necessary to achieve these ends.

#### a. Mr. Ferguson's Guilty Plea Provides General Deterrence.

A noncustodial sentence is adequate to provide general deterrence of criminal conduct for three reasons. ***First***, "[c]urrent empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, 'increases in severity of punishments do not yield significant (if any) marginal deterrent effects.'" *United States v. Velazquez*, No. 16 Cr. 233 (AKH), 2017 WL 2782037, at *4 (S.D.N.Y. May 26, 2017) (citation omitted); *see also United States v. Bannister*, 786 F. Supp. 2d 617, 660 (E.D.N.Y. 2011) ("[It] appears to be primarily in the certainty of punishment, not its severity, that deterrent power lies.") (citation omitted). Through this prosecution, and a related SEC settlement, the public understands that falsifying records of a

-18-

company carries both criminal and civil consequences.    Any punishment—noncustodial included—for this felony offense is sufficient to deter similar crimes.

*Second*, Mr. Ferguson already has paid a significant financial penalty to the SEC which promotes general deterrence despite no conceivable resulting loss to investors.    Courts have imposed noncustodial sentences in cases like this one where the financial penalties are higher than the loss caused.    For example, in *United States v. McCarthy*, the defendant pleaded guilty to failure to pay employment taxes, which carried a Guidelines range of 24 to 30 months' imprisonment. No. 22 Cr. 491 (NRM), 2023 WL 3741996, at *1 (E.D.N.Y. May 30, 2023).    In imposing a noncustodial sentence, the court stated that "[t]he goals of general deterrence and just punishment are served by this sentence: the offense has had a ruinous impact on Mr. McCarthy's life, and he is now subject to a very significant financial penalty."    *Id*. at *3.    The court also considered that due to the defendant's "lack of criminal history, his early and complete cooperation, and his expressions of shame and remorse, any term of incarceration would be far greater punishment than is necessary to achieve this end."    *Id*.; *see also United States v. Alatsas*, No. 06 Cr. 473 (JBW), 2008 WL 238559, at *2 (E.D.N.Y. Jan. 16, 2008) (concluding that, in a loan application fraud case with a Guidelines range of 24 to 30 months, "[g]eneral deterrence is also sufficiently satisfied by . . . [t]hree years' probation plus full restitution"); *United States v. Villella*, No. 07 Cr. 287 (RWS), 2007 U.S. Dist. LEXIS 72712, at *13 (S.D.N.Y. Sep. 25, 2007) (determining that a probationary sentence plus an above-minimum fine, restitution and community service and some additional financial restrictions were "sufficient but not greater than necessary to provide just punishment for this particular offense as well as adequate deterrence and protection of the public, pursuant to § 3553(a)(2)").

Mr. Ferguson's civil penalty of $50,000 is a significant amount when considering that the offense conduct caused no loss to investors and Mr. Ferguson never attempted to profit from his crime. The Court also may issue Mr. Ferguson a separate criminal fine for his conduct.[2] The financial penalties imposed upon Mr. Ferguson are a further general deterrent.

*Third*, Mr. Ferguson pleaded guilty without the need for an indictment. "Deterrence can be a double-edged sword and the Court is mindful that just as sentencing should be designed to deter criminal behavior, it should also avoid deterring cooperation." *United States v. Doe*, 323 F. Supp. 3d 368, 390 (E.D.N.Y. 2018) (citation omitted). Mr. Ferguson pleaded guilty months before his co-defendant, Brian McFadden, entered the same plea. Here, Mr. Ferguson's guilty plea likely influenced Mr. McFadden, the more culpable co-defendant, to accept responsibility and plead guilty. Effectively, Mr. Ferguson's guilty plea brought the government's investigation into this conduct to an end. To avoid deterring potential defendants from accepting responsibility without an indictment, a Guidelines sentence of probation is appropriate. A sentence of probation—particularly where the Guidelines confirm such a sentence is "generally appropriate"—encourages others without prior criminal history to accept responsibility, and plead guilty early and without an indictment, just as Mr. Ferguson has done here.

### b.     Mr. Ferguson's Guilty Plea and Civil Settlement Provide Specific Deterrence.

A custodial sentence is not necessary to deter Mr. Ferguson from committing further crimes. Despite Mr. Ferguson's otherwise law-abiding life, the guilty plea damages his reputation and brands him a felon forever. Also, through the SEC settlement, Mr. Ferguson received a five-year officer-and-director bar, paid a substantial penalty, and is enjoined from further violations of

---

[2] Mr. Ferguson also has expended substantial financial resources defending himself in this isolated event. Although such defense costs are not explicitly considered under the Sentencing Guidelines, they are an economic reality that creates a deterrent effect.

the securities laws.  *See* Cease-and-Desist Order, *SEC v. Ferguson*, 1:26-cv-01482-DLC (S.D.N.Y. Feb. 27, 2026), Dkt. No. 8.  In other words, Mr. Ferguson, who has retired from public-company work and is approaching the end of his career, has received a specific financial deterrent.  He never will be involved with public securities markets again.  Nothing further is required to prevent recurrence of any misconduct.  *See United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) ("Elimination of the defendant's ability to engage in similar or related activities—or indeed any major business activity—for some time, and the substantial loss of assets and income . . . constitutes a source of both individual and general deterrence."), *aff'd,* 31 F.3d 73 (2d Cir. 1994); *see also United States v. Nesbeth*, 188 F. Supp. 3d 179, 194 (E.D.N.Y. 2016) (***below-Guidelines*** sentence of probation sufficient where defendant would not be able to pursue a teaching career as a result of her conviction).

### 4.    A Noncustodial Sentence Is Available Under § 3553(a)(3).

Under 18 U.S.C. § 3553(a)(3), the court shall consider "the kinds of sentences available." Here, the PSR sets forth potential sentences including a term of probation of not less than one or greater than five years.  *See* PSR ¶ 16.  More importantly, as provided in the PSR, probation is the "generally appropriate" sentence for Mr. Ferguson's offense.  *Id.*; *see also* U.S.S.G. § 5C1.1 (Application Note 9).[3]  There is nothing about Mr. Ferguson's offense that warrants a sentence outside the "generally appropriate" sentence.

---

[3] A sentence of Probation is appropriate.  However, if the Court is not inclined to sentence Mr. Ferguson to probation, home detention is an available and appropriate condition for this offense.  *See* U.S.S.G. § 5F1.2.  As previously stated, Mr. Ferguson has a strong support network that he relies on and that relies on him.  A sentence of home detention would avail Mr. Ferguson of that support.

### 5.    A Noncustodial Sentence Would Avoid Unwarranted Sentencing Disparities Under § 3553 (a)(6).

A probation sentence is necessary to avoid unwarranted sentencing disparities because defendants with an offense level seven under § 2B1.1 generally receive probation.

Federal sentencing statistics generally support a sentence of probation. Over the last five years, there were 205 defendants who, like Mr. Ferguson, had a primary sentencing guideline of § 2B1.1, an offense level of seven, and a criminal history category of I. *See* PSR, Appendix A. Of these defendants, the median sentence imposed was zero months in prison. The data generally demonstrates that defendants with an offense level seven whose primary Guideline is § 2B1.1 are sentenced to probation.

Moreover, a defendant in this District who recently pleaded guilty to a more egregious violation of the same books-and-records violation received a noncustodial sentence. *See United States v. Jacoby*, No. 17-cr-676, Dkt. No. 15 (S.D.N.Y. 2018). In *Jacoby*, the defendant pleaded guilty to a single charge of making a false statement to auditors in violation of 15 U.S.C. §§ 78m and 78ff and was sentenced to probation ***despite a higher suggested Guidelines range of 4 to 10 months' incarceration***. There, the former chief financial officer and principal accounting officer of a publicly traded company created a backdated memorandum that purported to document a $1.1 million transaction. *Id.*, Dkt. No. 13, at 2-3. That defendant not only created the falsified memorandum but also asked his contact at a distributor to send the memorandum to his company email address as a newly identified document. *Id.* The backdated memorandum deceived auditors by allowing the company to include an additional $1.1 million on the company's balance sheet, which misled public investors. *Id.* at 5. Despite the Guidelines calculation of 4 to 10 months

-22-

incarceration, *see id.*, Dkt. No. 19, at 3, the court sentenced that defendant (Jacoby) to a ***below-Guidelines*** sentence of two years' supervised release, *id.*, Dkt. No. 15, at 3.[4]

Mr. Ferguson bears less culpability and has a lower Guidelines range than the defendant in *Jacoby*, so there is no justification for departing from the "generally appropriate" sentence of probation. The defendant's conduct in *Jacoby* was worse than Mr. Ferguson's and in many ways was akin to Brian McFadden's. Jacoby, like McFadden, created a backdated document that he shared with another company that then sent the document to him to bolster an appearance of legitimacy. *See id.*, Dkt. No. 13, at 2–3. Mr. Ferguson ***did not create*** the backdated order that was included in the spreadsheet provided to FINRA; McFadden did. Mr. Ferguson did not work with a third party to have a backdated document sent to him; McFadden did without Mr. Ferguson's knowledge or involvement. Mr. Ferguson merely submitted a spreadsheet that included a reference to the false, backdated order to FINRA—an important distinction that demonstrates that his conduct is of lesser culpability than McFadden's conduct. Mr. Ferguson's conduct was comparable to the defendant's conduct in *Jacoby* only in the positive respects that it was aberrational and limited in scope and severity. *See id.*, Dkt. No. 19, at 13 ("I thought about . . . the fact that this is the only criminal activity for which you will have been convicted in a long working career . . . ."). There is no justification for imposing a custodial sentence at the high end of the Guidelines range when doing so would be inconsistent with a comparable and recent sentence in this District.

---

[4] The court sentenced Mr. Jacoby to "time served," however, Mr. Jacoby did not spend any time incarcerated.

-24-

## IV.      CONCLUSION

For the foregoing reasons, Mr. Ferguson respectfully requests that the Court impose a term of probation.

DATED: April 20, 2026                                    Respectfully submitted,

                                                         /s/ *Bradley J. Bondi*
                                                         Bradley J. Bondi
                                                         Sara E. Ortiz
                                                         Samuel M. Deau (*Pro Hac Vice Forthcoming*)
                                                         PAUL HASTINGS LLP
                                                         200 Park Avenue
                                                         New York, NY 10166
                                                         (212) 318-6920
                                                         bradbondi@paulhastings.com

                                                         *Counsel for Christopher Ferguson*

cc: Counsel for government (via ECF and email)